# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br> Plaintiff, <br><br><br> v. <br><br><br> **ALFREDO ORTIZ-ORTIZ**, <br> Defendant. | CRIM. NO. 21-192 (RAM-MDM) |

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION AND BACKGROUND

On May 20, 2021, at around 4:00PM, Puerto Rico Police Bureau ("PRPB") officers assigned to the Arecibo Narcotics Unit conducted a traffic stop on a white Toyota Tacoma (the "Toyota Tacoma," the "Tacoma," or the "Vehicle") that had been reported stolen some five months earlier in December 2020. The defendant, Alfredo Ortiz-Ortiz ("Ortiz-Ortiz" or the "Defendant"), was arrested for driving the stolen Vehicle in violation of Puerto Rico's Law 8. PRPB officers seized a small blue bag from within the main cabin of the Vehicle, inside of which they found:

1. One (1) Glock pistol, model 23, .40 caliber, serial number GSX925, loaded with 8 rounds of .40 caliber ammunition,

2. Three (3) 22-round extended magazines, each loaded with 20 rounds of .40 caliber ammunition,

3. One (1) black iPhone with a black cover,

4. One (1) silver iPhone with a black cover,

5. One (1) plastic bag containing suboxone strips, and

6. A prescription for buprenorphine/naloxone, which is a generic form of suboxone, issued in the Defendant's name.

The officers also seized (1) green iPhone with a black cover found in the Defendant's possession as well as $680.00 in cash.

PRPB officers mirandized the Defendant immediately upon his arrest after which he made some incriminating statements. Later, after transporting the Defendant to the precinct, the officers provided him with a PRPB Advice of Rights Form. He initially checked the box indicating his consent to waive his *Miranda* rights. Almost immediately thereafter, however, he changed his mind, crossed out his initial mark, and checked the box indicating that he did not want to waive his *Miranda* Rights. He then signed the PRPB Advice of Rights Form indicating that he understood his rights and that indeed he was choosing *not* to waive them.[1] (Exs. 9 & 9a).

A few hours later, the Defendant was transferred to the custody of the Alcohol, Tobacco, Firearms and Explosives ("ATF"). While in ATF custody, agents again advised the Defendant of his *Miranda* rights and provided him an ATF Advice of Rights Form. The Defendant signed the ATF Advice of Rights Form indicating that he was waiving his *Miranda* rights, including his right to counsel. The Defendant then sat for a recorded interview with federal agents.

After providing the interview, the Defendant was arrested by federal agents and charged by way of a criminal complaint with being a felon in possession of a firearm and ammunition, in violation of Title 18, *United States Code*, Section 922(g)(1). On May 26, 2021, the grand jury returned an indictment also charging the Defendant with being a felon in possession of a firearm and ammunition in violation of Title 18, *United States Code*, Section 922(g)(1).

On March 8, 2022, the Defendant filed a Motion to Suppress (the "Motion to Suppress") challenging the constitutionality of the warrantless search of the Vehicle during which officers seized the blue bag and its contents. The Motion to Suppress also seeks the suppression of the incriminating statements the Defendant made to ATF Agents arguing that they were elicited in violation of his *Miranda* rights. And finally, the Defendant requested a hearing pursuant to *Franks v. Delaware*,

---

[1] The Defendant also signed a second PRPB Advice of Rights Form approximately one hour and fifty minutes later again declining to waive his *Miranda* rights. That form will be discussed further below.

438 U.S. 54 (1978), alleging that the affidavit in support of the June 18, 2021, search warrant targeting several cellphones recovered from the Defendant contained intentionally false or recklessly untrue statements that are material to a finding of probable cause. As such, the Defendant claims that if the Court strikes the materially false statements from the affidavit, the warrant would be left without the necessary probable cause.

A hearing on the Motion to Suppress and pursuant to *Franks v. Delaware* was held over the span of three days.[2] At the Court's request, the parties filed supplemental briefing, which was completed in August of 2023. For the reasons that follow, the Court **Grants in Part** and **Denies in Part** Defendant's Motion to Suppress. Docket No. 23.

## II. FACTUAL FINDINGS

After listening to two government witnesses and one defense witness,[3] reviewing several dozen exhibits admitted into evidence during the evidentiary hearing, and evaluating the factual submissions included in both the pre-hearing and post-hearing briefs submitted by the parties, the Court makes the following findings of fact.

### *The Intervention by PRPB Arecibo Drug Division Agents*

On February 6, 2021 at approximately 11:25AM, PRPB Sergeant ("Sgt.") Pedro L. Ramos Adorno ("Sgt. Ramos"), a twenty-three-year veteran of the Puerto Rico Police Bureau and Supervisor of the Arecibo Drug Division, was in an unmarked police vehicle transporting a co-worker to the hospital when he saw a white Toyota Tacoma coming out of Las Rosas Ward in Manatí, Puerto Rico, an area known for a high incidence of crime including the distribution of controlled substances. (Docket No. 57, Transcript ("Tr.") at 18).

---

[2] The hearing was held on January 18, 2023, January 20, 2023, and February 7, 2023.

[3] The government called two live witnesses, PRPB Sgt. Pedro Ramos Adorno and ATF Special Agent Jorge Escribano. The defense, meanwhile, called only PRPB Agent Alvin Candelario Meléndez from the PRPB Arecibo Division Stolen Vehicles Unit to the stand.

Being only 50 feet away from the Vehicle, Sgt. Ramos took a photo of the driver, who was the only occupant, and memorized the license plate number. (Docket No. 57, Tr. at 19 & 22. *See also* Exhibit 1). Later that same day, after returning to his office in the Arecibo Drug Division, Sgt. Ramos ran a check of the Vehicle's license plate number and discovered that it had been reported stolen during a burglary in December 2020. (Docket No. 57, Tr. at 23, 24 & 94). After discovering that the Vehicle was stolen, Sgt. Ramos immediately went back out on the street in an attempt to locate the Vehicle, but he was unsuccessful. (*Id.* at 25).

Approximately five months later, on May 20, 2021, at around 4:00PM, while driving his personal vehicle, Sgt. Ramos again saw the Toyota Tacoma drive by as he was exiting the Manatí Drugs Division. (*Id.* at 25). He was able to recognize the Vehicle because it had the same license plate number as the Toyota Tacoma he had seen back in February. (*Id.* at 25).

While following the Vehicle, Sgt. Ramos called the dispatch officer of the Drugs Division to inform him that he was in pursuit of a stolen vehicle. (*Id.* at 27-28). The information he received from the dispatch officer confirmed that the Vehicle still appeared as reported stolen in the Puerto Rico Police System. (*Id.* at 27-28).

Sgt. Ramos then saw two fellow officers from the Drug Division coming out of a nearby bakery and he flagged them down to request their assistance in pursuing the stolen Vehicle. (*Id. at* 28.). Together, they followed the Tacoma while it made a legal U-turn. The marked patrol car then activated its lights and siren and pulled the Tacoma over. (*Id. at* 30). Sgt. Ramos then approached the Vehicle wearing civilian clothes and asked the driver for his license and the registration for the Vehicle. (*Id.* at 31, *See also* Ex. 3, 4 & 4a). After the driver produced his license and the registration, Sgt. Ramos ordered him out of the Vehicle and told him to stand behind the Vehicle for their mutual safety. *Docket 57, Tr.* at 31. Sgt. Ramos indicated that the driver of the Tacoma that day bore a "great similarity" to the driver of the Tacoma he had seen earlier in February of that same year—that person being the Defendant Alfredo Ortiz-Ortiz. *Id.* at 34-35.

After moving behind the Vehicle, Sgt. Ramos placed the Defendant under arrest for being in possession of a stolen vehicle. *Id.* at 35. Then, after placing him under arrest, Sgt. Ramos advised the Defendant of his *Miranda* rights orally. *Id.* at line 19. After so advising him, Sgt. Ramos began asking him some questions regarding the Vehicle. *Id.* at 35-36 and 73-74. For example, he asked him, "Whose Vehicle it is?" To wit, the Defendant responded, "it belonged to a friend of his, but he didn't know the name of the owner." *Id.* at 36.

With the Defendant handcuffed behind the Vehicle, Sgt. Ramos searched his person and found $680.00 in cash in his pocket. *Id.* at lines 17-18. Sgt. Ramos then approached the driver's side of the Vehicle, the door of which had been left open upon the Defendant's exit. *Id.* at 37. With the Defendant by his side, Sgt. Ramos could see on the floor of the Vehicle's cabin a blue "Hilfiger-brand"[4] bag with stripes whose zipper was open. *Id.* at 37 & 40. In plain view, Sgt. Ramos could see part of a firearm magazine inside the blue bag, and he could see that the magazine was connected to a firearm. *Id.* at 37. Sgt. Ramos then asked the Defendant if he had a weapon's permit for the firearm, to wit he said, "No." *Id.* at 38 & 41. Defendant then added that he did not have a permit for the firearm because he was on federal probation at the time.[5] *Id.* at 41.

### *The First PRPB Advice of Rights Form*

Sgt. Ramos then proceeded to secure the contents of the blue bag while the Defendant was transported to the Drugs Division in Manatí by Agent Ruiz. *Id.* at 41-42. Upon arriving at the Drugs Division in Manatí, the first thing that Sgt. Ramos did was hand the Defendant a PRPB Advice of Rights Form in his native language, Spanish (the "Form"). Govt. Ex. 9 & Ex. 9a. The form contained the following advisements in a box labeled, "Warnings:"

---

[4] The Court understands "Hilfiger-brand" to mean the designer brand "Tommy Hilfiger."

[5] The Motion to Suppress does not challenge the constitutionality of these statements made after the verbal reading of Defendant's *Miranda* rights.

1. You have the right to remain silent and refuse to answer questions.

2. Anything you do say may be used against you in a court of law.

3. You have the right to consult an attorney before talking to a member of the Police and you have the right to have an attorney present while you are being questioned now or in the future.

4. If you cannot afford to retain counsel and wish one. One will be appointed by the state before any questioning if you wish.

5. If you decide to answer [questions] now without the presence of counsel, you will always have the right to stop the questioning until you speak to one.

6. Knowing and understanding your rights, after having been explained, do you wish to answer without the presence of counsel?

Docket No. 28-1 & 28-2. (the "*Miranda* Warnings")

Underneath these *Miranda* Warnings, the form contained the following heading: "SUSPECT'S STATEMENT ABOUT THEIR CONSENT TO THE QUESTIONING." *See id.* Beneath that heading was the following: "Instructions: Complete the information requested below and place an x in the square (□) of one of the following options in the presence of a witness and member of the police." *See id.*

Sgt. Ramos read the form to him aloud without asking him any questions. The Defendant then reviewed the form and placed a check mark in the box next to the following statement:

> "I understand the rights that those warnings grant me, and **I voluntarily waive** them fully aware that I can stop the questioning and invoke my right to be assisted by an attorney at any moment. The waiver of these rights has been made voluntarily, without coercion, intimidation, violence, pressure, or any promise."

*See id.* (Emphasis in original). The Defendant then signed and dated the form "May 20, 2021, at 5:20PM." PRPB Agent Nelson Cordero Santana then signed the form as the police witness. *See id.* Docket No. 57, Tr. at 49.

Because Defendant had waived his *Miranda* rights by checking the appropriate box on the form, Sgt. Ramos began asking him questions about the Vehicle, whereupon the Defendant changed his mind about waiving his rights and proceeded to cross out the mark he had previously made on the form and instead marked a different box indicating that "I understand the rights that these warnings grant me, and I have decided to **NOT waive** them." Govt. Ex. 9 & Ex. 9a; Docket No. 57, Tr. at 50. (Emphasis in original). Respecting Defendant's decision, Sgt. Ramos ceased all further questioning and concluded the interrogation. *Id.* at 51.

### *The First Inventory Search and the Property Receipt Form*

After the Defendant invoked his *Miranda* rights, Sgt. Ramos proceeded to verify the contents of the blue bag in the presence of the Defendant by removing everything from inside. *Id.* at 42. From the blue bag, Sgt. Ramos seized a firearm, three cellphones, four magazines, sixty-eight (68) .40 caliber bullets, two (2) keys for the stolen Toyota Tacoma, and a prescription for buprenorphine/naloxone, which is a generic form of suboxone, issued in the Defendant's name. *Id.* at 41-42. *See also* Govt. Exhibits 11-13. The Defendant was then given a copy of the inventory form, which he signed in the presence of Sgt. Ramos, acknowledging that the property had been seized from him. Docket No. 57, Tr. at 45.

As part of the inventory search of the Vehicle, Sgt. Ramos also noted a trailer license plate ending in 4629A[6] that was attached to the driver's side area of the Vehicle. *Id.* at 54. After returning to his office, Sgt. Ramos conducted a database search of that trailer license plate, and it came back registered to the Defendant, Alfredo Ortiz-Ortiz. *Id.* at 55.

Furthermore, Sgt. Ramos noticed that the Vehicle had a hitch typically used for transporting trailers that was installed on the back bumper. A subsequent investigation by federal agents indicated that the actual owner of the Vehicle had never installed such a hitch. *Id.* at 56.

---

[6] Sgt. Ramos explained during his testimony that the purpose of the trailer license plate ("arrastre" as it is known in Spanish) is to legally transport boats, jet skis and the like, using a trailer that is pulled behind the vehicle.

### *The Second Inventory Search conducted by Stolen Vehicle Division*

Shortly after PRPB agents from the Manatí Drugs Division conducted their inventory search of the Vehicle, agents from the Arecibo Stolen Vehicle Division conducted a second inventory search. *Id.* at 353. PRPB Agent Alvin Candelario was in charge of conducting the inventory search of the stolen Toyota Tacoma. During that second inventory search, agents found a black "Coach" fanny pack containing personal items belonging to the Defendant, including "a black notebook and some COVID tests, analysis, and some other documentation that w[as ultimately] tendered to [the Defendant's] wife." *Id.* at 86. Agent Candelario then prepared a Property Receipt Form, known as a Form 98, to document that which was found during the stolen Vehicle's inventory search. *Id.* at 355. Agent Candelario then gave the Defendant a PRPB Advice of Rights Form for him to review and sign. *Id.* at 356. This was the second PRPB Advice of Rights Form that had been given to the Defendant within the previous couple hours. This second form was identical to the first form he had signed before Sgt. Ramos and Agent Cordero.

The Defendant proceeded to read the form himself and then he placed his initials next to each of the warnings/rights listed at the top of the form. *Id.* at 361. He also checked the box indicating that he "**EXERCISED** [his] right to read [the warnings] himself." *Id.* at 353. *See also* Def. Ex. B & B-1. He then checked a second box indicating that "[he] understand[s] the rights that the warnings grant [him] and that [he has] decided to **NOT WAIVE** them." *Id.* (Emphasis in original). The Defendant then signed the form and dated it "May 20, 2021, at 7:10PM" (the "Second PRPB Advice of Rights Form"). *Id.* at 360. Agent Candelario then signed the Second PRPB Advice of Rights Form as the only police member present during its signing. *Id.* at 369, lines 21-23.

During the suppression hearing, Agent Candelario explained that if the Defendant had waived his *Miranda* rights, he would have asked him questions related to the stolen Vehicle investigation. *Id.* at 365. But, because he elected to *not waive* his rights, Agent Candelario asked him no questions.

### *The Intervention of Federal ATF Agents*

In the afternoon hours of May 20, 2021, an unamed Task Force Officer ("TFO") from the Bureau of Alcohol Tobacco, Firearms and Explosives ("ATF") received a duty call from Sgt. Ramos related to the earlier intervention with the Defendant. *Id.* at 97. Upon arriving at the Manatí Precinct, ATF Special Agent Jorge Escribano-Rossy met directly with Sgt. Ramos. Agent Escribano asked Sgt. Ramos if the Defendant had been read his *Miranda* rights, to wit he said, "Yes." Agent Escribano did *not*, however, ask Sgt. Ramos if the Defendant had elected to waive or instead invoke his *Miranda* rights. Notwithstanding that uncertainty, Agent Escribano nevertheless proceeded to interview the Defendant, together with ATF TFO Christopher García and ATF TFO Lieutenant Luis Rivera.

The interview began around 8:59PM, on May 20, 2021, with the agents asking the Defendant some basic background information like his full name and his residential address. They then proceeded to read him his *Miranda* rights from the standard ATF/Department of Justice (DOJ) Advice of Rights Form. *See* Ex. 14 & Ex. 14a. At the top of the form is a Section entitled "Statement of Rights." Under the heading "Statement of Rights" is the following list of *Miranda* rights:

> You have the right to remain silent.
>
> Any statements you make can be used against you in any legal proceeding.
>
> You have the right to speak with an attorney before being questioned and to have the attorney present with you during any questioning.
>
> If you cannot afford an attorney, one will be appointed for before you are asked any questions.
>
> If you decide to answer our questions at this moment without having an attorney present, you will always have the right to stop answering questions whenever you'd like.

After the Defendant was read his *Miranda* rights aloud from the ATF Advice of Rights Form, he placed his initials next to each one of the rights listed.

Then, below the Statement of Rights is another Section entitled "Waiver." The Section entitled "Waiver" reads as follows:

> I have read this statement of my rights, or it has been read
> to me, and I understand my rights. At this moment, I am
> willing to answer questions without having a lawyer
> present. I have not been made any promises, nor has any
> pressure of any kind been used against me.

Docket 28-4, Govt. Ex. 14 & Ex. 14(a). The Defendant then signed the form in the
signature block below the Waiver section and dated the document "5/20/2021" at
"8:59PM." ATF TFO Christopher García signed the form as the police witness. Then,
in addition to having read him his *Miranda* rights from the ATF Advice of Rights
Form, Agent Escribano proceeded to explain them to the Defendant again orally. *Id.*
at 100 at lines 9-14.

After having been read his *Miranda* rights no less than two times by the
federal agents, Agent Escribano began discussing with the Defendant the
circumstances related to his arrest and how it was that he came to be before them
that evening. The Defendant calmly, courteously, and professionally answered each
question posed by the agents.[7] The only questions he refused to answer were those
that would have forced him to identify and implicate one or more other individuals
whom the Defendant obviously feared greatly. Govt. Ex. 15

The interview with ATF Agents was audio recorded in its entirety.
*See* Government's Exhibit 15. The Court recounts below several excerpts from the
audio recorded interview that are relevant to this discussion.[8]

**Excerpt #1**

> **OFFICER 1:**[9]   . . . Okay. Well, look, Alfredo, at this
> time, I'm going to read your rights, to then go over the
> reason why you're here.
> You have the right to remain silent. Any statement
> you make can be used against you in a legal proceeding.

---

[7] The Court is able to describe the interview as such after having listened to the full audio
recording of the interview that was admitted during the hearing as Government's Exhibit 15.

[8] The relevant excerpts quoted herein are presented in chronological order. Moreover, because
there is some dispute between the parties as to the actual meaning given to that which was said, all
the excerpts are quoted *verbatim*. Docket No. 31-1 (original Spanish) and Docket No. 31-2 (English
translation).

[9] The interviewer identified as "Officer 1" was ATF Special Agent Jorge Escribano.

You have the right to speak with an attorney before we ask you any questions and to have them present with you during the questions.

If you do not have money to hire an attorney, one can be provided to you before we ask you any questions. If you chose to answer our questions at this time without having an attorney present, you will always have the right to stop answering any question. At this time, your rights have been read to you.

You understand your rights? At this time, you are willing to answer our questions without having an attorney present. No promise has been made to you, no pressure, no force in any way against you.

Do you understand your rights?

**DEFENDANT:** I understand my rights, yes.

**OFFICER 1:** Okay. Can you sign here? Okay. You're going to put your initials on each point.

**DEFENDANT:** Uh-huh.

**OFFICER 1:** Sign. Print name, please. Okay. There. And put it in print.

**DEFENDANT:** [Unintelligible].

**OFFICER 1:** Uh-huh. You sign it.

(Docket No. 31-2, at p.5, line 6 – p.6, line 12).

\*   \*   \*

## Excerpt #2

**OFFICER 1:** Tell me, Alfredo, what happened today?

**DEFENDANT:** I was driving, and they stopped me. They told me to stop and they – they stopped me, um . . . Telling me that they were looking for a vehicle like that, with those descriptions.   I told him to – to do what they had to do. And I got out with the vehicle's license and my license in the other hand, you know, to give them to the officer. And he said that he didn't want that, that he–as if they already knew what they were doing or something. Um

> . . . Then another one came and—and he handcuffed me,
> and they brought me here.

(Docket No. 31-2, at p.7, line 21– p.8, line 8).

\* \* \*

**Excerpt  #3**

> **OFFICER 1:**    Okay. Um . . . When you presented
> your license and the title of the vehicle, was the title under
> your name?
>
> **DEFENDANT:** No, no.
>
> **OFFICER 1:**    Okay. Whose name was the vehicle
> under? If you remember.
>
> **DEFENDANT:** No -- I'm not aware of ever having —
> no — I don't know — I don't know.

(Docket No. 31-2, at p.9, line 7 – p.9, line 14).

\* \* \*

**Excerpt #4**

> **OFFICER 1:**    Okay. Who owns the vehicle? You
> do?
>
> **DEFENDANT:** No.
>
> **OFFICER 1:**    And whose is it?
>
> **DEFENDANT:** It's someone else's.
>
> **OFFICER 1:**    Okay.
>
> **OFFICER 2:**[10]  Do you know the name of that other
> person?
>
> **DEFENDANT:** No.

(Docket No. 31-2, at p.10, line 6 – p.10, line 14).

---

[10] The interviewer identified as "Officer 2" was ATF TFO Lieutenant Luis Rivera.

*   *   *

**Excerpt #5**

      **OFFICER 1:**   What did the cops find after you were placed under arrest?

      **DEFENDANT:** No — I don't —I don't know where they got the—the gun, because they told me there was a—a—a gun in a bag, *but that wasn't my bag*. My bag is a small Coach. I don't know -- I don't know where they got it, you know? (Emphasis added).

      Then they pulled me over and said, "Look, there's a gun there."

      **OFFICER 1:**   How do you describe your bag?

      **DEFENDANT:** Mine?

      **OFFICER 1:**   Uh-huh. It's a Coach, but what color?

      **DEFENDANT:** Black and gray Coach.

(Docket No. 31-2, at p.12, line 19 – p.13, line 7).

*   *   *

**Excerpt #6**

      **OFFICER 1:**   *Okay. The bag where they found the gun, what color was it?*

      **DEFENDANT:** *I didn't see it.*

      **OFFICER 1:**   You didn't see it. *Have you seen that bag before?*

      **DEFENDANT:** *No, I hadn't seen it.*

      **OFFICER 2:**   Did they take it out of the vehicle? Did you see where —?

      **DEFENDANT:** They never took it out of the vehicle. They told me it was there. That–that–that–anyway,

Case 3:21-cr-00192-RAM   Document 76   Filed 12/18/23   Page 14 of 33

United States v. Alfredo Ortiz-Ortiz                                    Page 14
Crim. No. 21-192 (RAM)(MDM)

[unintelligible]–because they suddenly said, "Ah, he's armed, he's armed."

(Docket No. 31-2, at p.13, line 17 – p.14, line 6). (Emphasis added).

\*   \*   \*

## Excerpt #7

**OFFICER 1:**   Okay. Well, then, can we say that the gun was in the car?

**DEFENDANT:** Yes.

(Docket No. 31-2, at p.14, line 13 – p.14, line 15).

\*   \*   \*

## Excerpt #8

**DEFENDANT**: Did my probation officer send you here?

**OFFICER 1:**   No, man, no.

**DEFENDANT**: No?

**OFFICER 1:**   The sergeant [Ramos] spoke with us.

**DEFENDANT**: Oh, oh. Yes.

**OFFICER 1:**   You understand me?

**DEFENDANT**: Yes, because I haven't — no – I haven't had a break to call him yet, you know?

**OFFICER 2**:   No —

**DEFENDANT**: I haven't called anybody.

**OFFICER 1**:   No, don't worry. But in — in due time you're going to be able to call and you're going to be able to communicate with the pertinent people.

(Docket No. 31-2, at p.16, line 17 – p.17, line 6).

*   *   *

**Excerpt #9**

> **OFFICER 1:**    Okay. Did you know there was a gun inside that vehicle?
>
> **DEFENDANT:** No.

(Docket No. 31-2, at p.17, line 25 – p.18, line 2).

*   *   *

**Excerpt #10**

> **DEFENDANT:** You know what the thing is, officer? I don't know how, but they already know I'm here.[11] I haven't called anyone.
>
> **OFFICER 1:**    All right, but you haven't been released either. Don't — don't jump to conclusions, Alfredo. I mean, don't — don't jump to conclusions.
>
> **DEFENDANT:** It's the truth, officer. I have to be realistic.
>
> **OFFICER 1:** Well, fine, but why are you worrying then?

(Docket No. 31-2, at p.21, line 18 – p.22, line 3).

*   *   *

**Excerpt #11**

> **OFFICER 1:** If there are photos, we are not –
>
> **OFFICER 2:** Because if it's something personal about you with women, that's of no interest to us. We are looking for criminal activity. Number two.
>
> Number three: the truth is, how did the cops get to where you were? What makes you think that they didn't call from up there to be – to intervene with you? You had—you've already gone through a federal process, and

---

[11] The "they" the Defendant is referring to here are the people in the neighborhood of whom he is most fearful.

Case 3:21-cr-00192-RAM   Document 76   Filed 12/18/23   Page 16 of 33

United States v. Alfredo Ortiz-Ortiz                                          Page 16
Crim. No. 21-192 (RAM)(MDM)

you know that in the federal prison, the top dog—the top
dog, the one who doesn't like to go—can't take the heat is
the first one that goes like this, you know? And possibly—or
do you see an attorney here? Because they already know.

Where is the attorney down there? There is no
attorney here. There is no snitch here. That   is   not—that
word doesn't exist, you understand me?

(Docket No. 31-2, at p.24, line 22 – p.25, line 14).

*   *   *

**Excerpt #12**

**DEFENDANT:** I don't think you can do much to help
me, officer.  You know?  And forgive me, but no—I don't
think it's—that there's a lot I can do for myself, you know,
because what I'm going to do is make things worse.

**OFFICER 1:**   Why?

**DEFENDANT:** Well, every—every—every action has
its—its consequence, you know? And   I'd   rather   leave
things as they are, for my attorney to help me in any way
he can.

**OFFICER 1:** I mean, so you're willing to face
whichever conviction comes your way?

**DEFENDANT:** No, because, you know, if I'm
innocent, my attorney —you know, he has to — you know,
not -- something that doesn't fit or this and that, he has to
—has to prove my innocence. It's — that's what I believe in.

**OFFICER 1:** Okay. I mean, so you think you're
innocent?

**DEFENDANT:** Yes.

(Docket No. 31-2, at p.29, lines 4–23).

*   *   *

**Excerpt  #13**

**OFFICER 2:**    I ask you, from what you are telling
me, every action has its consequence — and I will tell you

the same thing because, well, it's not going to be an open secret.

Um . . . You will have an attorney. You — you already know the procedure. I'm not going to go into detail on that.

Um . . . If it later turns out that you show up in an investigation, we'll come back.

So, what are the chances of contacting your attorney and saying — "Look, tell your client that now, apart from everything he has, he has this — if he wants to talk to us again." You understand that, once you have an attorney, that your attorney is going deliver the message and tell you what's up, then you can think it through and: "Wait, let me think about it. Because I'm not going to put a noose around my neck," and you want to talk to us again . . . You know what you are doing, you know? You — if you are innocent, as you say you are, then do not limit yourself to today, do not limit yourself to this intervention.

(Docket No. 31-2, at p.31, line 19 – p.32, line 22).

\*   \*   \*

During the Defendant's audio recorded interview, the ATF agents attempted to get him to voluntarily consent to a search of the three cellphones that were seized by Sgt. Ramos during the earlier intervention, but the Defendant refused.[12] Docket No. 31-2 at p.14, line 20, through 17, line 14. His refusal therefore forced the agents to have to seek a search warrant from the Court. On June 18, 2021, Magistrate Judge Bruce McGiverin issued a warrant to search the three cellphones in Case No. 21-806 (M).

---

[12] From the transcript of the interview of the Defendant, it appears that the Defendant claimed ownership over the "minty green" color cellphone only. Docket No. 31-2, at 30, lines 2-25 through 31, lines 16. With respect to the gray color cellphone, the Defendant said, "he do[esn't] know what it is." *Id.* at 31, lines 17-18. The Defendant also mentioned that "there was supposed to be a red one because [he] saw it. A red Samsung." *Id.* at 31 lines 16-17.

United States v. Alfredo Ortiz-Ortiz
Crim. No. 21-192 (RAM)(MDM)

Page 18

### III. LEGAL DISCUSSION

**A. The Defendant failed to meet his burden to demonstrate that he has standing to challenge the search and seizure of the blue "Hilfiger-brand" bag that was found inside the passenger cabin of the stolen white Toyota Tacoma.**

The Defendant's first contention in support of his Motion to Suppress is that law enforcement illegally searched and subsequently seized the blue "Hilfiger-brand" bag and its contents, from inside the passenger cabin of the Vehicle. The Defendant claims that because Sgt. Ramos immediately removed him from the Vehicle, placed him in handcuffs, and relocated him to an area behind the Vehicle, the blue bag containing the firearm and ammunition was no longer within his "immediate control" when Sgt. Ramos conducted the search. As such, under *Arizona v. Gant*, 556 U.S. 332 (2009), Sgt. Ramos was prohibited from searching the Vehicle "incident to arrest" because the Defendant could no longer "gain[] access to the Tacoma." Docket No. 66 at 8.

The Government disputes the Defendant's legal argument and further submits that, as a threshold matter, the Defendant lacks standing to even raise such an argument because the Vehicle he was driving, the Toyota Tacoma, was stolen. Accordingly, he did not have an expectation of privacy recognized under the law. After careful review of the voluminous record in this case, the Court agrees with the Government that the Defendant lacks standing to challenge the search of the blue bag from inside the stolen Vehicle.

It is well-settled that before embarking upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized. *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988) (citing *United States v. Salvucci*, 448 U.S. 83 (1990). This burden, which rests squarely on the defendant, must be carried at the time of the pretrial hearing and on the record compiled at that hearing. *Aguirre,* 839 F.2d at 856 (citing *United States v. Gómez*, 770 F.2d 251, 253 (1st Cir. 1985)). *See* Fed.R.Crim.P. 12(b)(3). Unless and until the "standing" threshold is crossed, the

Case 3:21-cr-00192-RAM   Document 76   Filed 12/18/23   Page 19 of 33

United States v. Alfredo Ortiz-Ortiz                                          Page 19
Crim. No. 21-192 (RAM)(MDM)

*bona fides* of the search and seizure are not put legitimately into issue. *Aguirre*, at 856.

To establish standing, a defendant "must show that he had both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) (citing *California v. Greenwood*, 486 U.S. 35 (1988)). In cases dealing with the search of a vehicle, for example, a defendant must demonstrate ownership, possession, or control of the vehicle as a preliminary step in establishing a reasonable expectation of privacy. A mere brief association with the vehicle is not sufficient to establish a reasonable expectation of privacy. *United States v. Payne*, 119 F.3d 637 (8th Cir). *United States v. Malady*, 209 F. App'x 848, 851 (10th Cir. 2006) ("It is well established that a defendant does not have any legitimate expectation of privacy in a stolen vehicle or its contents.") *United States v. Ghazaryan*, 685 F. App'x 222, 223 (4th Cir. 2017) ("An occupant of a stolen vehicle cannot claim a legitimate expectation of privacy in either the vehicle or containers found in that vehicle.")

Consistent with that premise, the First Circuit has catalogued the following list of factors which are pertinent to this threshold inquiry: ownership, possession, and/or control; historical use of the property searched, or the things seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. *Aguirre*, at 856-57; *See e.g.*, Gómez, 770 F.2d at 254; *United States v. Lochan*, 674 F.2d 960, 965 (1st Cir. 1982).

In this case, it is important to note that the Defendant's Motion to Suppress does not challenge the search of the actual Vehicle, the Toyota Tacoma. Instead, the Defendant only challenges the search and subsequent seizure of the blue "Hilfiger-brand" bag that was found on the floor of the passenger cabin of the Vehicle.[13] To establish standing, the Defendant claims that he has consistently

---

[13] To be clear, the Defendant stated in his post-hearing brief that,

> [T]he government gave much emphasis to Ortiz's lack of standing to challenge the seizure of the Tacoma. However, the seizure of the

asserted a possessory interest over this blue "Hilfiger-brand." Docket 66, at 7. Indeed, the Defendant even attempts to claim that his possessory interest over the blue bag is "*uncontroverted*" because "[t]he government alleges that the blue bag belongs to Ortiz and . . . his personal items were inside."[14] *Id.* The Court finds, however, that Defendant's claim of a possessory interest over the blue bag is not supported by the record.

To begin with, though the Defendant contends in his post-hearing brief that the Government "alleges that the blue bag belongs to the Defendant," he fails to cite to a single page in the record that supports such a proposition, and the Court has likewise found none. As the parties well know, "it is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. Indeed, '[j]udges are not expected to be mindreaders. 'Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace.'" *United States v. Zannino,* 895 F.2d 1 (1st Cir. 1990). For that reason, and without doing Defendant's work for him, the Court cannot agree with the contention that his possessory interest in the blue "Hilfiger-brand" bag is "uncontroverted."

Instead, to the extent that any fact is "uncontroverted" in the record, it would be the fact that, as shown by the Defendant's own words, at the time of his arrest he unequivocally disassociated himself from the blue "Hilfiger-brand" bag. More specifically, in Excerpt #5 from his audio recorded interview with ATF Agents, the Defendant engaged in the following exchange:

> **OFFICER 1:**   What did the cops find after you were placed under arrest?
>
> **DEFENDANT:** No — I don't —I don't know where they got the—the gun, because they told me there was

___

Tacoma was not one of the three issues raised in Ortiz's Motion to Suppress. *See* D.E. 23. Ortiz, however, raised a possessory interest in the blue bag, and challenges its seizure and search. Docket 66, at 7.

[14] The record does show that a prescription for buprenorphine/naloxone, which is a generic form of suboxone, issued in the Defendant's name was found inside the blue bag.

a—a—a gun in a bag, *but that wasn't my bag.[15] My bag is a small Coach. I don't know -- I don't know where they got it, you know?*

Then they pulled me over and said, "Look, there's a gun there."

> **OFFICER 1:** *How do you describe your bag*?
>
> **DEFENDANT:** Mine?
>
> **OFFICER 1:** *Uh-huh. It's a Coach*, but what color?
>
> **DEFENDANT:** *Black and gray Coach.*

(Docket No. 31-2, at p.12, line 19 – p.13, line 7). (Emphasis added).

Based on the above exchange, the only bag over which the Defendant claimed an actual possessory interest was the black and gray "Coach-brand" bag. Indeed, in this excerpt, he expressly disclaims any possessory interest over the blue "Hilfiger-brand" bag.

Then, in Excerpt #6, the defendant again disclaimed any possessory interest over the blue "Hilfiger-brand" bag and even denied having seen the blue bag before or even knowing what color it was.

Excerpt #6 provided as follows:

> **OFFICER 1:** Okay. *The bag where they found the gun, what color was it?*
>
> **DEFENDANT:** *I didn't see it.*
>
> **OFFICER 1:** You didn't see it. *Have you seen that bag before?*
>
> **DEFENDANT:** *No, I hadn't seen it.*
>
> **OFFICER 2:** Did they take it out of the vehicle? Did you see where —?

---

[15] There were only two bags found in the Vehicle, the gray and black "Coach" bag, over which the Defendant does claim an ownership or possessory interest and the blue "Hifiger-brand" bag over which he does not claim any ownership or possessory interest.

Case 3:21-cr-00192-RAM   Document 76   Filed 12/18/23   Page 22 of 33

United States v. Alfredo Ortiz-Ortiz                                                    Page 22
Crim. No. 21-192 (RAM)(MDM)

> **DEFENDANT:** They never took it out of the vehicle. They told me it was there. That–that–that–anyway, [unintelligible]–because they suddenly said, "Ah, he's armed, he's armed."

(Docket No. 31-2, at p.13, line 17 – p.14, line 6). (Emphasis added).

In summary, the evidence gleaned from the hearing demonstrates that the Defendant disclaimed ownership or even having any knowledge of the existence of the blue "Hilfiger-brand" bag. Therefore, because he had no knowledge of the existence of the blue bag, it would be impossible for the Defendant to claim a possessory interest over it.

Indeed, the First Circuit was faced with a similar situation in the case of *United States v. Garcia-Rosa*, 876 F.2d 209, 219 (1st Cir. 1989). In *García-Rosa*, the Court stated as follows:

> During the suppression hearing, Rivera Ortiz never claimed that the box was his or explained why he had a subjective, let alone an objectively reasonable, expectation of privacy in its contents. It may well be that Rivera Ortiz had a reasonable expectation of privacy in the contents of the box, but if so, he failed to assert it at the suppression hearing. In fact, in his appellate brief, Rivera Ortiz goes out of his way to stress that the box was in his *wife's* dresser, which was in his *wife's* bedroom. *See* Brief for Appellant Rivera Ortiz at 15. Under these circumstances, we cannot overlook Rivera Ortiz' failure to assert an expectation of privacy in the contents of the box. We appreciate that Rivera Ortiz may have feared that any interest he claimed in the box at the suppression hearing would be used against him at trial, but it has been well settled for over twenty years that testimony given to meet standing requirements cannot be used as direct evidence against the defendant at trial on the question of guilt or innocence. *See Simmons v. United States,* 390 U.S. 377, 390, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968); *see also United States v. Salvucci,* 448 U.S. 83, 93–94 & n.9, 100 S.Ct. 2547, 2553–54 & n. 9, 65 L.Ed.2d 619 (1980) (leaving open the possibility that suppression testimony can be used for impeachment purposes).

Case 3:21-cr-00192-RAM   Document 76   Filed 12/18/23   Page 23 of 33

United States v. Alfredo Ortiz-Ortiz                                                              Page 23
Crim. No. 21-192 (RAM)(MDM)

In this case, too, the Court finds that the Defendant's repeated pleas of ignorance as to the existence of the blue "Hilfiger-brand" bag falls well-short of meeting his burden to demonstrate that he had a reasonable possessory interest over it. The Court therefore finds that the Defendant lacks standing to challenge its search and seizure by law enforcement. It is recommended then that the Motion to Suppress, as it relates to the blue "Hilfiger-brand" bag and its contents, be **DENIED**.

**B. Law enforcement agents were precluded from interrogating the Defendant after he invoked his *Miranda* right to counsel by signing two PRPB Advice of Rights Forms to that effect.**

Pursuant to the Fifth Amendment of the U.S. Constitution, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. This privilege from self-incrimination, "the essential mainstay of our adversary system," "is fulfilled only when the person is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Miranda v. Arizona*, 384 U.S. 436, 460 (1966) (internal quotation marks and citation omitted). To protect this right, the Supreme Court has held that a person subjected to "custodial interrogation" by law enforcement officers "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. "This bedrock rule recognizes that 'in a custodial interrogation, the police have the capacity to dominate the scene to such an extent that the risks of coercion and intimidation are unreasonably high.'" *United States v. Angel Soler Muñiz,* Crim. No. 19-247 (RAM), Docket No. 59 at 3 (Report and Recommendation) (J. McGiverin) (quoting *United States v. Hughes*, 640 F.3d 428, 434–35 (1st Cir. 2011) (quoting *United States v. Meléndez*, 228 F.3d 19, 22 (1st Cir. 2009)). Accordingly, the *Miranda* warnings "are designed 'to protect against the extraordinary danger of compelled self-incrimination that is inherent in such situations.'" *Hughes, 640 F.3d* at 435.

A suspect who has received *Miranda* warnings may waive his or her rights and consent to an interrogation. *United States v. Carpentino*, 948 F.3d 10, 20 (1st Cir. 2020) (citing *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)). However, "[i]f the

accused indicates that he wishes to remain silent, the interrogation must cease. If he requests counsel, the interrogation must cease until an attorney is present." *Johnston v. Mitchell*, 871 F.3d 52, 57 (1st Cir. 2017) (quoting *Edwards*, 451 U.S. at 482) (internal quotation marks and citation omitted). *"[O]nce a suspect has invoked the right to counsel, knowledge of that request is imparted to all law enforcement officers who subsequently deal with the suspect.*" *United States v. Porter*, 764 F.2d 1, 7 (1st Cir. 1985) (internal quotations marks and citations omitted). (Emphasis added). If officers resume questioning after a suspect invokes the right to counsel, any *Miranda* waiver they obtain is presumed involuntary. *Carpentino*, 948 F.3d at 22. Where officials violate these rules, evidence gathered as a result of the violation is generally excluded. *Johnston*, 871 F.3d at 58.

The threshold question, which is dispositive here, is whether the Defendant unambiguously invoked his right to counsel. "This threshold inquiry is an objective one." *James v. Marshall*, 322 F.3d 103, 108 (1st Cir. 2003). "Invocation of the *Miranda* right to counsel requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *United States v. Sweeney*, 887 F.3d 529, 536 (1st Cir.), cert. denied, 139 S. Ct. 322 (2018) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). A suspect must articulate his desire to have counsel "sufficiently clearly that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. A suspect thus invokes the right to counsel when he or she "'unequivocally demand[s] assistance, request[s] the lawyer's presence, or otherwise clearly indicate[s] an unwillingness to make a statement absent the presence of an attorney.'" *Carpentino*, 948 F.3d at 24 (quoting *United States v. Oquendo-Rivas*, 750 F.3d 12, 19 (1st Cir. 2014)).

In *Miranda,* the Supreme Court held that the police must advise a suspect of his right to counsel and, "[i]f the individual states that he wants an attorney, the interrogation must cease *until an attorney is present*." 384 U.S. at 474. (Emphasis added). Several years later, in *Edwards v. Arizona*, 451, U.S. 477 (1981), the Court explained that "it is inconsistent with *Miranda* and its progeny for authorities, at

Case 3:21-cr-00192-RAM   Document 76   Filed 12/18/23   Page 25 of 33

United States v. Alfredo Ortiz-Ortiz                                    Page 25
Crim. No. 21-192 (RAM)(MDM)

their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Edwards v. Arizona*, 451 U.S. at 485 (1981). Thus, when a suspect "express[es] his desire to deal with the police only through counsel," the police cannot interrogate him "*until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Id.* at 484–85. (Emphasis added).

If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver, and his statements would be considered voluntary under traditional standards. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).

The purpose of the rule formulated in *Edwards* is to prevent police "badgering or overreaching—explicit or subtle, deliberate or unintentional." *United States v. Johnson*, 400 F.3d 187, 194 (2005) (quoting *Smith v. Illinois*, 469 U.S. 91, 98, 105 (1984) (internal quotation marks and citations omitted)). Police officers simply cannot continue to question a suspect despite his request for counsel "in the hope that [he] might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." *Id.* at 99 (internal quotation marks and citation omitted). Even after the suspect has spoken with counsel, "officials may not reinitiate interrogation without counsel present." *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990). This prohibition applies to all officers, not just those present when the suspect invoked his right to counsel. *Arizona v. Roberson*, 486 U.S. 675, 687–88 (1988) (citation omitted).

The Supreme Court has directed that two elements be examined to determine whether the police have obtained a statement in violation of Edwards' "rigid prophylactic rule." *Johnson*, at 194 (quoting *Smith*, 469 U.S. at 95 (internal quotation marks and citation omitted). A court must "determine whether the accused actually invoked his right to counsel." *Id.* If he did, the court must determine who initiated the further discussions that yielded the eventual statement. *See id.* If an accused, after invoking his right to counsel, did not "initiate[ ] further discussions with the

United States v. Alfredo Ortiz-Ortiz
Crim. No. 21-192 (RAM)(MDM)

Page 26

police" or "knowingly and intelligently waive[d] the right he had invoked," any statement procured by the police is inadmissible at trial. *Id.*

The crux of defendant's argument here is simple. He signed two PRPB Advice of Rights Forms wherein he indicated on both forms a desire **NOT** to waive his *Miranda* rights. More specifically, in signing the first PRPB Advice of Rights Form, he initially checked the box indicating a desire to WAIVE all of his *Miranda* rights. Then, after realizing that waiving his rights precipitated further questioning by Sgt. Ramos, the Defendant crossed out the first mark he made[16] and proceeded to check the other box indicating that he "decided to **NOT waive**" his rights. The Defendant then remained silent, and Sgt. Ramos ceased all questioning in acknowledgement of Defendant's exercise of his *Miranda* rights.

Approximately one hour and fifty minutes later, at 7:10PM, the Defendant was given a second PRPB Advice of Rights Form by PRPB Agent Candelario. *Id.* at 356. The Defendant proceeded to fill out the second form exercising his *Miranda* rights in the same fashion as the first, only this time without the need for correction. After checking the box indicating that he exercised [his] right to read [the warnings] himself," the Defendant checked the second box indicating that "[he] understand[s] the rights that the warnings grant [him] and that [he has] decided to **NOT WAIVE** them." *Id.* The Defendant contends that these facts demonstrate his unambiguous desire to invoke all his *Miranda* rights, including his right to counsel.

The Government submits on the other hand, that checking the box indicating that he was *not* waiving his *Miranda* rights was not a "clear and unambiguous" invocation of his right to counsel because the form "simply treats all rights together." Docket No. 72 at 25. Instead, the Government suggests that "if the Defendant wanted to unambiguously invoke this right to counsel, he should have written a request for an attorney on the form," or he could have "verbally requested an attorney" from any of the three agents with whom he spoke that day. *Id.* The Government's argument misses the mark.

---

[16] The Defendant even placed his initials next to his cross-out as if to acknowledge the correction made.

Here, unlike other cases where the suspects' statements were held to be ambiguous, the Defendant did nothing to muddy the waters and compromise the invocation of his *Miranda* rights. His statements and actions indicating a decision to invoke his rights were simple, clear, and direct. He filled out both PRPB Advice of Rights Forms in a manner that clearly expressed his desire to **NOT waive** any of his *Miranda* rights. Then, consistent with that desire not to waive his rights, the Defendant remained silent and refused to answer any questions from the PRPB agents. Any reasonable officer under the circumstances would understand that Defendant was exercising his right to counsel. Indeed, the fact that both PRPB officers immediately ended their interrogations when the Defendant filled out the forms as he did, suggests that they understood as much.

If, however, there is any ambiguity about the Defendant's invocation of his right to counsel, it results from the language in the Forms and not from anything the Defendant did or said. It is correct, as the Government argues, that the PRPB Advice of Rights Forms are far from a model of clarity; the forms make a generalized statement that invokes all *Miranda* rights together at once. However, if the Court were to interpret the PRPB Form as urged by the Government, their use might result in some suspects waiving their rights to counsel when they do not intend to do so.

The Court agrees, however, with the Fourth Circuit, which noted in *Johnson*, 400 F.3d at 197, that:

> Because "we should indulge every reasonable presumption against waiver of fundamental constitutional rights," *Michigan v. Jackson*, 475 U.S. 625, 633, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986) (internal quotation marks and citation omitted), we cannot interpret an ambiguity caused by the Government to be a waiver of the right that "is indispensable to the protection of the Fifth Amendment privilege," that is, the right to counsel. *Miranda*, 384 U.S. at 469. (Citations omitted).

As the court in *Johnson* did, I too, "refuse to fault the [D]efendant for any ambiguities—intentional or otherwise—created by the Government." *Johnson*, 400 F.3d at 196. I find therefore that the Defendant duly invoked his right to counsel

when he filled out the two PRPB Advice of Rights Forms and checked the boxes on each form indicating his desire to **NOT waive** any of his rights.

Having invoked his right to counsel, the Defendant was not to be interrogated without counsel unless he initiated further communication with law enforcement. *See Edwards*, 451 U.S. at 484-85. And nothing in the record supports a finding that the Defendant initiated contact with the ATF Agents. Indeed, the Government does not even allege that the Defendant initiated contact with law enforcement. Its brief is totally silent on the subject.

Though the ATF agents advised the Defendant of his *Miranda* rights before interviewing him (*see* Govt. Ex 15), any waiver of those rights is presumed involuntary because he had previously invoked his right to counsel when he filled out the two PRPB Advice of Rights Forms. *Carpentino*, 948 F.3d at 22. The Defendant's statements were therefore obtained in derogation of his Fifth Amendment privilege against self-incrimination and are *inadmissible* in the Government's case-in-chief. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *Oregon v. Hass*, 420 U.S. 714. 722-24 (1975).

The exclusionary rule operates to exclude all evidence derived from the officer's illegality, the so-called "fruit of the poisonous tree." *Wong Sun v. U.S.*, 371 U.S. 471, 485, 487-88 (1963). The purpose of the exclusionary rule is to deter police misconduct. *Ariz. v. Evans*, 514 U.S. 1, 10 (1995). In this case, the ATF agents dropped the ball by failing to inquire into Defendant's reaction to the reading of his *Miranda* rights. It was not enough for the federal agents to have merely asked Sgt. Ramos whether the Defendant had been read his *Miranda* rights. They had a duty to inquire as to whether he had invoked or waived those rights after having been duly advised. That question was never asked. If they had asked that question, they would have learned that the Defendant invoked his rights and they would have known that they could not reinitiate contact unless they had provided him an attorney or unless the Defendant himself initiated contact with them. Agent Escribano so recognized in his testimony. Under these circumstances, the fact that the agents initiated a new round

of interrogation without providing the Defendant an attorney constituted misconduct that warrants suppression.

The Court therefore recommends that Defendant's Motion to Suppress challenging the constitutionality of the statements he gave to ATF Agents be **GRANTED** and that all statements made during that interrogation, including the audio recording of the interrogation, be suppressed and unavailable for use in the Government's case-in-chief.

### C. The Defendant failed to meet his heavy burden under *Franks v. Delaware* to be granted a hearing.

In his Motion to Suppress, the Defendant requested a *Franks* hearing to procure the suppression of all evidence gathered through a search warrant for the cellphones recovered from the Vehicle based on the contention that "the search warrant affidavit for the cellphones included false statements that were necessary to finding probable cause and that the search warrant rested on information and evidence unlawfully obtained." Docket No. 23 at 12.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, and generally requires law enforcement officers to secure a warrant supported by probable cause prior to effecting a search or seizure. *United States v. Rigaud*, 664 F.3d 169, 173 (1st Cir. 2012) (citing *United States v. Paneto*, 661 F.3d 709, 713 (1st Cir. 2011)). Probable cause to support a search warrant exists when the totality of the circumstances suggests that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (citing *United States v. Hicks*, 575 F.3d 130, 136 (1st Cir. 2009) (internal quotation marks omitted)).

Information supporting probable cause is set out in an affidavit submitted with the application for a search warrant. Although "[t]here is . . . a presumption of validity with respect to the affidavit supporting the search warrant," that presumption may be refuted during what is known as a *Franks* hearing. *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

Case 3:21-cr-00192-RAM   Document 76   Filed 12/18/23   Page 30 of 33

United States v. Alfredo Ortiz-Ortiz                                          Page 30
Crim. No. 21-192 (RAM)(MDM)

To obtain a *Franks* hearing, a party must first make two "substantial preliminary showings:" (1) that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth; and (2) the falsehood or omission was necessary to the finding of probable cause. *See id*. at 155–56; *Hicks*, 575 F.3d at 138; *United States v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002). In other words, the false statement or the omission must be shown to be material to the ultimate decision to issue the search warrant. Failure to make a showing as to either element dooms a party's request for a hearing and for any remedy pursuant to *Franks*.

Based on the First Circuit's opinion in *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005), a defendant can also challenge the validity of a search warrant when (1) the warrant rested on illegally obtained information, (2) there is no independent source for the information, (3) the agent's decision to seek the warrant was prompted by the illegally obtained information, and (4) the information affected a Magistrate's Judge's decision to issue the search warrant. *Id*. at (*citing Murray v. United States*, 487 U.S. 533, 535-36 (1988)). In such cases, a *Franks* hearing would also be appropriate.

In the event that at the hearing "the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side [or the omitted material included], the affidavit's . . . content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.

To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. *Id*. at 171. Moreover, a defendant's own denial of the statement which he purports to be false, without more, is insufficient to satisfy, and falls well short of, the "substantial preliminary showing necessary to justify a *Franks* hearing." *United States v. Moon*, 802 F.3d 135, 150-51 (1st Cir. 2015). *See also, United States v. Southard*, 700 F.2d 1, 10 (1st Cir. 1983) (upholding rejection of *Franks* hearing where district court found

appellants' flat denials of gambling-related conversations insufficient to meet the "substantial preliminary showing" requirement). There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. *They should point out specifically the portion of the warrant affidavit that is claimed to be false*; and they should be accompanied by a statement of supporting reasons. *Id. Affidavits* or sworn or otherwise reliable statements of witnesses *should be furnished, or their absence satisfactorily explained. Id.* Allegations of negligence or innocent mistakes are insufficient. *Id.* The deliberate falsity or reckless disregard whose impeachment is permitted is only that of the affiant, not of any nongovernmental informant. *Id.* Finally, if these requirements are met, and if, when the material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. *Id.* On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.

### *The Fatal Flaw in Defendant's Right to a Franks Hearing*

On June 1, 2022, the presiding judge in this case granted Defendant's request for an evidentiary hearing. The Court's Order granting the hearing stated as follows:

> Defendant made a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record. *United States v. Cintron*, 724 F.3d 32, 36 (1st Cir. 2013). Suppression Hearing is set for 8/19/2022 at 9:00 AM in Courtroom 7 before Judge Raul M. Arias-Marxuach.

*See* Docket Entry Order No. 35. Several months later, on November 7, 2022, the presiding judge referred the Motion to Suppress to the undersigned for the holding of a "Suppression Hearing and a Report and Recommendation." Docket Entry Order No. 45. Prior to holding the suppression hearing, however, no determination was yet made as to whether the Defendant had actually met his initial threshold burden to be granted a hearing under *Franks*. A review of the record now reveals, however, that the Defendant has not met the burden for the holding of a *Franks* hearing nor for a remedy pursuant thereto.

Case 3:21-cr-00192-RAM   Document 76   Filed 12/18/23   Page 32 of 33

United States v. Alfredo Ortiz-Ortiz                                                    Page 32
Crim. No. 21-192 (RAM)(MDM)

The Court notes a fatal flaw with the Defendant's request for a *Franks* hearing: the Court does not have before it either the application for the warrant, the warrant, nor the affidavit in support of the warrant that the Defendant seeks to challenge under *Franks*. While the Defendant did allege in a footnote in his post-hearing brief that "the Court should note that the facts in support of probable cause for the search warrant are identical to the facts in support of the Criminal Complaint" (*see* D.E. 1-1." Docket No. 66 at n.4.), the documents critical to the issue presented to the Court were not attached to the original Motion to Suppress, were not introduced into evidence during the suppression hearing, nor were they included in Defendant's post-hearing filings. *See* Docket Nos. 62 & 63 Government's and Defendant's Exhibit Lists. Therefore, they are not before the Court for consideration.

In fact, had the Court not specifically asked counsel for the Government during the suppression hearing, "Who was the affiant?" the Court would not know to this day that the affiant for the search warrant was ATF TFO Christopher García, an agent who was not called to testify during the suppression hearing. Docket No. 57 at 137, lines 14-16.

In *United States v. Pérez-Velázquez*, 488 F. Supp. 2d 82 (D.P.R 2007), the Court was similarly faced with a request for a *Franks* hearing where the defendant failed to submit to the Court the very affidavit whose veracity he was questioning. In attempting to overcome this blatant deficiency, the defendant argued that the Court "was required to direct [defense counsel] to submit the actual affidavit of [the agent] to the Court **before** ruling in the motion." *Id.* at 90. (Emphasis in original). The court disagreed and stated as follows:

> It is counsel's ethical and professional responsibility to determine the best course of action and litigation strategy to protect and defend his/her client's interest. It would be highly improper for the Court to indicate [to] either party how to prosecute or defend a case. In the instant case, it is defendant's obligation to submit to the Court all the evidence necessary to meet the burden of proof required under the motion to suppress standard.

In this case, given the fact that the burden rests squarely with the Defendant to make two "substantial preliminary showings:" (1) that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth; and (2) the falsehood or omission was necessary to the finding of probable cause, the Court cannot say that the Defendant has met that burden because he did not bring forth before the Court the very affidavit that is being challenged. This failure makes it impossible for the Court to *specifically identify the portion of the warrant affidavit that is claimed to be false* or to individually determine whether there are falsehoods in the document that destroy the probable cause finding.

For that reason, the Court finds that the Defendant has neither met his initial threshold burden under *Franks* nor proven by a preponderance of the evidence that a material falsehood contained within the affidavit vitiated the probable cause finding of the search warrant. The Court therefore recommends that the Defendant's request for the suppression of the evidence procured through the search warrant pursuant to a *Franks* violation be **DENIED**.

## IV. CONCLUSION

For the reasons espoused above, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendant's Motion to Suppress. Docket 23.

**IT IS SO RECOMMENDED.**

The parties have fourteen days to file any objections to this Report and Recommendation. Failure to file the same within the specified time waives the right to appeal this Report and Recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994); *United State v. Valencia Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 18th day of December 2023.

<u>s/Marshal D. Morgan</u>
MARSHAL D. MORGAN
UNITED STATES MAGISTRATE JUDGE